| | |
|---|---|
| **R.Z., a minor, by her parents** ) | |
| **and next friends, EDWARD P. ZIMMER** ) | |
| **AND SHERRI ZIMMER; and** ) | |
| **EDWARD P. ZIMMER and** ) | |
| **SHERRI ZIMMER, individually,** ) | |
| ) | |
| **Plaintiffs,** ) | **Cause No. 1:10-cv-1117-WTL-DKL** |
| ) | |
| **vs.** ) | |
| ) | |
| **CARMEL CLAY SCHOOLS and** ) | |
| **BETTY CAMPBELL,** ) | |
| ) | |
| **Defendants.** | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the Defendants' motion for summary judgment. The

motion is fully briefed, and the Court, being duly advised, **GRANTS** the Defendants' motion for

the reasons set forth below.

## I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the

admissible evidence presented by the non-moving party must be believed and all reasonable

inferences must be drawn in the non-movant's favor.  *Hemsworth v. Quotesmith.com, Inc.*, 476

F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view

the record in the light most favorable to the nonmoving party and draw all reasonable inferences

in that party's favor.").  However, "[a] party who bears the burden of proof on a particular issue

may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations,

that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. <u>FACTUAL BACKGROUND</u>

Plaintiffs R.Z. and her parents, Edward and Sherri Zimmer, allege that Defendant Betty Campbell and her employer, Carmel Clay Schools ("CCS"), have infringed R.Z.'s rights to freedom of speech, free exercise of religion, and equal protection. The facts taken in the light most favorable to the Plaintiffs are as follow.

On morning of November 7, 2008, eighth-grade student R.Z. was riding to school in a school bus driven by Betty Campbell. After arriving at the school and parking the bus, Campbell stood up and flashed the dome lights, which is a signal to student-passengers to pay attention to the driver. Campbell then gave the following speech:

> I want it quiet. And that includes all of you. This week we had a very historic election.[1] Okay. It's called diversity in this country. The diversity here – we've got kids on this bus who are Jewish, Catholic, I've had Muslims, I've had Buddhists, Sikhs, fine. That's why we are what we are. I don't care if you're gay. I don't care what you are. All those diverse things are what make this country what it is. I don't care if you are evangelical. What I will not tolerate is your own personal views being espoused on this bus that you are going to go to hell if you don't do it the way I do it. We've had this conversation before, we've had it for three years. We're not going to have it again. If you can't believe in tolerance towards one another, you don't belong here. You belong in a parochial church school. I don't want to hear one more word about anybody going to hell if they are gay or if they're Buddhist or whatever, cause it is none of your damn business. You take care of you and you let everybody else take care of them and you know what, we're a lot better off for it. Is there any complaints? I didn't think so.

---

[1] Campbell is referring to the election of Barack Obama that occurred two days prior.

2

When Campbell flashed the lights, R.Z., who was sitting at the back of the bus, was listening to her iPod. She turned the iPod off. R.Z. thought Campbell's speech was directed at the seventh graders who were sitting in front her, so she turned her music back on and did not hear the end of the speech.

On the November 7 afternoon route, Campbell asked R.Z. if she would take to heart what Campbell had said that morning. She thought she heard R.Z. say "huh?" or "what?" which suggested to her that R.Z. had not paid attention. When she asked R.Z. a second time whether she would take to heart what Campbell had said, R.Z. said "Yeah," and Campbell replied, "Good. I will not put up with it."

After completing her route that same afternoon, Campbell returned to the Zimmers' home and parked the bus. Campbell called the number for R.Z. on the student roster and received no answer. She saw R.Z., her older sister S.Z., who used to ride Campbell's bus, and some of R.Z.'s friends on the driveway using colorguard flags. Campbell exited the bus and approached R.Z. and S.Z. She asked the girls if their mother was home. The girls said "no." Campbell responded by saying "good," but she later explained that she had no intention of evading Mrs. Zimmer. She said she needed to speak with R.Z. on the bus. S.Z. said R.Z.'s name and expressed hesitation about getting on the bus, but Campbell responded that S.Z. could accompany them on the bus. Campbell knew any conversation on the bus would be recorded on the surveillance video.

After R.Z. and S.Z. joined Campbell on the bus, Campbell confronted R.Z. about not listening to her speech that morning. R.Z. admitted to having heard "some." Campbell then also confronted R.Z. because she believed R.Z. had told another student, M.E., that he or his brother was going to go to hell because M.E's brother was gay. That discussion follows.

B.C.:   I've known you a lot of years, I've never had a bit of trouble with you. When a bus driver flips on the lights, and stands up to talk, do you listen?

R.Z.:   Yeah.

B.C.:   What'd I say this morning?

R.Z.    Umm, you said like, something about gay people going to hell. Like, sorry, no, not saying, like, you shouldn't say gay people should go to hell and like opinions . . .

B.C.:   In other words, you didn't understand a word I said, did you?

R.Z.:   [Inaudible].

B.C.:   No, because you had your headphones on and you weren't listening, were you?

R.Z.:   No, I was listening some. I just had paused it.

B.C.:   When a bus driver stands up and says "listen up," you're supposed to pay attention, not listen to your headphones. I don't want to see you with any device on this bus . . .

R.Z.:   Okay.

B.C.:   I don't want to see a phone, I don't want to see an iPod, if you can't pay attention. . . . Bigotry ain't going to cut it on my bus. I don't care what your religion is. You can be as churchy as you want, Evangelical as you want, but you can't tell people on this bus, "if your brother's gay he is going to hell."

R.Z.:   I, I never said that.

B.C.:   Yes you have, repeatedly. I have had complaints and I'm not tolerating it. I've had you go off on other people on religion. Jews aren't going to go to hell.

R.Z.:   I, I never said that.

B.C.:   Darlin' every year -- You [directed toward S.Z.] weren't like this. Where did she come out like this? I have never, in all those years of having you guys on the bus, every year I have to chew her out because she is throwing religion in people's faces. You can't do that. This is a public school. If

4

you were in a church school, you could talk like that, you know what I mean. You can't tell somebody who is, we have Buddhist, we have Sikhs, we have atheists, we have Muslims, we have Catholics, we have every kind of Christian imaginable on this bus. You can't say that stuff. You understand? I'm not trying to be mean, but you can't talk like that to people.

R.Z.:   I never said that.

B.C.:   I have heard you darlin'. I mean it's not like I've never heard you say. You sat right there and don't you remember me reaming you out because I was so angry with you for saying cause it was uhh… who, which one is Jewish? The girl with the pretty hair?

R.Z.:   Anna.

B.C.:   . . . You can't. I mean if you are zealous in your religion, that's wonderful. I'm not griping. That's….Everybody's got their own rights, but you can't go off and tell other people you are going to hell, or you gotta do it my way. No they don't have to do it your way.

R.Z.:   That's that's, [shaking head "no."]

B.C.:   Darlin' you do. I've heard you myself.

S.Z.:   She would never say that, that someone is going to hell for that. Cause we have been taught…

B.C.:   I will put my hand on, I know, I will put my hand on your Bible because I have heard her say it.

R.Z.:   I wouldn't say gay people are going to go to hell.

B.C.    Why would . . . M.E. would have no reason in the world to come up . . .

R.Z.:   This is what happened. He's like, why don't you like Barack Obama? I said because he supports gay reli-r-- , gay marriage, and um, abor-

B.C.:   A lot of people do. I do.

S.Z.:   Well that's what she's saying that, that she doesn't like Barack Obama because of that.

B.C.: But that has nothing to do with what the disagreement was with his brother.

R.Z.: I never said anything about his brother.

B.C.: About his brother, it wasn't about Obama.

R.Z.: Yeah it was.

B.C.: C'mon, it wasn't politics. . .

R.Z.: No, listen, this is what happened, he's like, why don't you like Barack Obama? I said, um, because he supports gay religion and abortion and, then he's like, he's like, why don't you support gay religion, cuz I'm like it's against my religion, he said, "Fuck you."

B.C.: I think there was a lot more to it, dear. [R.Z. shakes head "no."] Especially when I know for a fact the girls all said you, "Rachel, did you hear what Betty said?" No answer outta you. She goes out of the bus this afternoon. Listen, I'm talking to you guys here, I'm not in a school, I'm not in the office. You see what I'm saying? I'd rather discuss this among us. That's why I am here now. I said, you get what I said this morning? And she's just lookin' blank as a door knob at me. And I think, she didn't hear a word I said to her. And I didn't say your name, and I wouldn't do that, you know I wouldn't, that, that's not my way.

B.C.: You understand, and, and I . . . this is getting into the politics of . . . gay marriage, and this is what bothers me, I think there should be a civil union, do whatever the heck they want but it's not religion, you know what I mean, it's not marriage per se. I didn't know until yesterday. Okay say we were a gay couple and we go to China, [laughter] and she, well it could be, it could be kiddo, and she would adopt a child and she died, that child isn't mine. You can't keep that kid. Or I'm filthy rich and she's not, I die, she does not inherit my money. That's what this is all about, there's different, there's different rules that they are throwing in, that's what, it's not about a moral thing. I'm not crazy about it either, but I don't think they have the right to take those things away from them. You know what I'm trying to say. It is not morally, it's not going there at all, but darlin' you gotta ease up. Talk to her [Directed at S.Z.]. Cause you've never, I've known you guys for years, and you gotta, you gotta just back off, ya know, let sleeping dogs lie or whatever. You might not agree, I don't agree with what everybody says, nobody agrees with everybody, that's just the way it is. That's what I was trying to say this morning, the diversity is what makes this country strong. None of us are alike, none of

us believe in the same thing, but that's why it works. You can't push your own view on somebody else.

R.Z.:    Okay.

B.C.:    Alrighty? I'm not taking a .. You understand what I'm sayin'?

R.Z.    Yeah.

B.C.:    But I mean, he's, he's devastated. Hard to picture, it's hard to picture [M.E.]with hurt feelings. Oh, you know M.E. But he is, he's "Betty she's talking about my . . . but I love my brother." And I thought, oh God. [R.Z.] don't do this to him. It's gotta be embarrassing for him.

[R.Z.'s mother, Sherri Zimmer, approaches the bus.]

Sherri: Hey guys.

B.C.:    Hi. You know it's gotta be embarrassing for him. It is embarrassing for him.

R.Z.:    I never said that though.

Sherri: What's going on?

B.C.:    She made some remarks to one of the guys about his gay brother and that he's gonna go to hell and that's why – I tried to call you, you weren't home. I wanted to talk to you because I, I'm not taking it, I didn't want to take it to the office. I tried to explain it to her this morning, but she's sitting with her headphones on and never listened to a word I said. That's why I'm here. Off, out of the school. Off the – cause you can't, no matter how you feel about it, you can't say it.

Sherri: Um, Did you know that Max said fuck you to her yesterday?

B.C.:    Yeah he got tired of her saying it to him.

Sherri: But that's okay for you? It's okay that he said that to her?

B.C.:    If you tell me my brother's going to hell over and over, I'd probably say it too.

R.Z.:    I never said that.

B.C.:   You have. They've heard you say it.

Sherri: Maybe they made it up.

B.C.:   No, they all like [R.Z.]. [R.Z.'s] popular. I'm just, she's gotta tone it
        down.

Sherri: Okay, but you're okay with that but you're not okay with him saying
        "Fuck you" to her? So you're okay with it, you're okay with him . . .
        saying that? You just, you just said it me.

B.C.:   Listen to why he said it. Doesn't that bother you?

Sherri: I, no it bothers me that he would use that kind of language to my daughter.

B.C.:   It doesn't bother you that what she said to him to get that kind of a
        reaction?

Sherri: I don't think she said that because we told her never to say that.

B.C.:   I do. I've had heard her sit up here and tell people they're going to go to
        hell if they don't believe like she does. I'll put my hand on your own
        Bible.

S.Z.:   Did she say I think that they might go to hell? Cause I don't think there's
        anything wrong with that.

B.C.:   It is on a bus. You can't, you just can't go there.

Sherri: So he can have his opinion that gay people are just fine, but she can't have
        her opinion that they're not? Right?

B.C.:   If her opinion is standing in front of a bus and saying "Your brother is
        going to go to hell." That isn't the same.

R.Z.:   I never said that.

Sherri: She is saying she never said that.

B.C.:   Well, there's a whole crew that says she did.

R.Z.:   This is what hap . . . No, this is what happened–

B.C.: And that's why we're talking here, cause it's not in the school, I'm not going there. I don't want to go there. You don't want me to go there. That, Oh God, this would stir up. . .

Sherri: I want you to go there.

B.C.: No. Because that would be harassment and it would, it would not be good in her record. That's what I'm saying, I just . . . just sitting here discussing it, alright? Because intolerance doesn't go on a diverse school bus, where I've got Sikhs, I've got Buddhists, I've got atheists, I've got Catholics, I've got Jews . . . You name it, I got it. And I've got lesbian and I've got gay. And you can't just . . . You can't do it. And yes I will talk to him about his language.

Sherri: Thank you.

B.C.: Of course I will. But don't don't ... I've never seen him upset before. I mean, generally you can't, you couldn't, you could hit a boy on the head with a brick. And for him to say I can't stand [R.Z.] talking about my brother. And I, I didn't know, I didn't know there was another brother.

Sherri: Did you bring, did you bring his brother up?

R.Z. No, no. I said, this is what happened, he said, this is what happened, like, three days ago, he's like, why don't you like Barack Obama? And I said like, because like some of his opinions, like, supporting gay marriage and abortion, and he's like, what do you have wrong with gay marriage? I'm like, cause it's against my religion and he said, "Fuck you."

Sherri: Well, [M.E.], [M.E.], probably thought that she was talking about him, but she never said it.

R.Z.: Yeah, but I never said . . .

B.C.: If it was one time, I'd say that – I've never had, I've never had [M.E.] complain. You know, and I've . . . for a guy to complain, you know what I mean they're too macho, but I mean that's [inaudible]. When I got to the school this morning, I clicked everything off, and when you turn the lights on and stand up, and that means you are supposed to listen to the driver. Did you listen to me?

R.Z.: I paused my iPod and listened a little bit.

B.C.: A little bit. She never heard a wor–that's why I came back. She didn't hear a word I said to her.

R.Z.  Yeah, I did hear her this morning.

Sherri: So why were you pausing if she was quiet and listening to her iPod? Why were you, why were you pausing? Like why did you pull the bus over and turn on all the lights?

B.C.: No, I didn't pull the bus over. When I got to the school, I flipped the lights on, and I got up, and I gave my speech about diversity that we have to respect other people's rights and opinions. I don't care who you are on here...

Sherri: Do you think he's respecting her opinion if he's telling–

B.C.: Listen to me!

Sherri: Don't yell at me. Don't you yell at me.

B.C.: Okay, fine. We'll just write it up and go from there.

Sherri: Great, write it up. I'd love to talk to the school about this.

B.C.: Please do.

Sherri: Because I'd love to have him written up for his mouth. Because to say "fuck you" to a girl on the bus is not right and it's a helluva lot worse–

B.C.: Oooh, you're cussing, you're cussing.

Sherri: So? It is a helluva lot worse than telling somebody that I don't agree with gay marriage. She can [dis]agree with gay marriage.

B.C.: That's not what she said to him. She said your brother is going to hell.

Sherri: Did you pull it up?

R.Z.: No, I never said that.

B.C.: I don't know, I haven't bothered, I haven't had 'em pull it up.

R.Z.: I never said to Anna, you can ask Anna, I never said she was going to hell. I even talked to her on like . . .

Sherri: Y'know what? Betty likes [M.E.], she always has, no matter what you said . . .

B.C.:  What does like have to do with it?

Sherri: You're off the bus. I will drive you to school rest of the year, I'm done with this.

B.C.:  I never said she was off the bus.

Sherri:  Come on. I did. Come on.

B.C.:  Oh, okay, that takes care of the whole problem then. See ya, [S.Z.].

## A. What Happened on November 5, 2008

On the morning after the presidential election, some of the students on the bus were discussing the results of the election. R.Z. expressed that she was disappointed about the election because she did not support President-elect Obama's views on gay marriage and abortion. During the course of her conversation with other students, she said that if Obama were elected "gays would take over the world" and that "God made Adam and Eve, not Adam and Adam." Other students shared their views, both supporting and in opposition to R.Z.'s views. Another student, M.E., was not part of this conversation that morning, but during the bus ride home that afternoon, M.E. asked R.Z. why she was opposed to Obama's election. R.Z. explained that she did not like Obama because of his positions on abortion and gay marriage, both of which went against her religious beliefs, to which M.E. responded, "Fuck you."

## B. What Campbell had been told

Two days later, on November 7, 2008, M.E. voiced concern about conversations with R.Z. to Campbell:

B.C.:  So you have a problem?

11

M.E.: Yeah. You know how those girls are like, annoying and stuff?

B.C.: Yes, they're very annoying. Just let me close . . . [closes bus door]

M.E.: It's come to the point where like [R.Z.] is like harassing me because my older brother, not Walt, is gay and I'm kind of proud of it. You know?

B.C.: You have every reason to be proud of it.

M.E.: Yeah, I'm glad that he is happy and stuff.

B.C.: I, you know [R.Z.'s] mom. They're very, extremely religious people.

M.E.: I know. I'd say this is about the fifth time she said I'm going to hell.

B.C.: I'll, I'll a, talk to her mom. I won't say anything on here because . . . . That's why we can't play the radio. But she'll sit there and listen to that son of a bitchin' cell phone with everything on there. And I told her mom, I said it's not that she's worrying about what horrible things she is going to hear, it's that she flat said that nobody can hear me over … I'll take care of it.

M.E.: Alright, thank you.

B.C.: Yes, nobody's business about your brother. Nobody's.

Campbell believed that the comments M.E. alleged R.Z. made to him were "wrong," but she did not think that R.Z. should be subjected to a disciplinary referral. Nor did she want to embarrass R.Z. by talking to her while off the bus at school because all the students on Campbell's bus and all the waiting buses would have seen Campbell talking to R.Z. For the same reason, Campbell did not want to ask R.Z. to remain on the bus and talk to her there. Therefore, Campbell decided that she would talk to the bus as a whole about tolerance and diversity without mentioning any student by name. When the bus arrived at school that morning, Campbell stood up and gave the speech described above.

## C. Events Following the Bus Confrontation

Immediately after the confrontation on the bus at the Zimmers' residence, Sherri Zimmer called the CCS transportation department and made a complaint. Mrs. Zimmer spoke with Christopher Glander, an assistant principal at Clay Middle School, and transportation and facilities director Ron Farrand about the incidents, and an investigation ensued. The Zimmers repeatedly requested the termination of Campbell's employment with CCS, but CCS did not fire her.

The Plaintiffs filed suit against the Defendants in August 2009, alleging, among other causes of action, that the Defendants violated Plaintiff R.Z.'s First Amendment and Equal Protection rights. The Complaint was amended four times, and in September 2010, the Defendants removed the case to this Court. The Defendants have now moved for summary judgment.

## III. <u>DISCUSSION</u>

In our lives, we bring our experiences and expectations to bear on our interactions with others. We listen to a speaker and add layers of meaning to the speaker's words based on our prior experiences with that speaker and in life. In some cases, we close gaps and make connections that are not apparent from the words themselves. Interpretation and contextualization of a conversation can often be the key to effective communication, but it can also be its downfall. This case is a unique example of the latter because the Court has the benefit of knowing exactly what words were spoken, as school bus surveillance video-recording equipment captured the words spoken by Campbell when she made her speeches to the bus and

to R.Z. and her sister.[2] By determining what contextual gloss must be applied to Campbell's speeches to support the Plaintiffs' asserted legal theory, the Court can derive the inferences the Plaintiffs have drawn from Campbell's lectures. It is the reasonableness of these inferences upon which much of this case turns.

## A. Freedom of Speech Claim

The Plaintiffs argue that both Campbell's speech to the bus and her confrontation with R.Z. violated R.Z.'s right of free speech.[3] According to the Plaintiffs, "Campbell's speech to the entire bus is an attack on anyone desiring to share their opinion about others, whether it is their sexual orientation or their religious beliefs." Thus, Plaintiffs argue, "the point and effect of her speech articulates a broad policy – one that prohibits students from sharing views that may be seen as intolerant and that espouses the superiority of one religious view over another." Plaintiffs also argue that, during Campbell's confrontation with R.Z., she is "clearly articulating a policy

---

[2] The Defendants make a desperate attempt to strike the surveillance video because the Plaintiffs have sought to include it in their motion for summary judgment by way of an affidavit of Plaintiff Edward Zimmer, who asserts that the video was "produced to [him] by the Defendants." According to the Defendants, Zimmer has no personal knowledge of what materials were produced because discovery was produced to Zimmer's attorney. This argument ignores the realities of the litigation discovery process. For the purposes of summary judgment, "evidence need not be admissible in form, but it must be admissible in content." *Stinnett v. Iron Works Gym/Exec. Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002). The Defendants have not argued that the content of the video recording is inadmissible; accordingly, the video is properly before the Court at this time.

The Defendants also seek to strike a personnel file included as an exhibit to the Plaintiffs' reply brief by way of Zimmer's affidavit. The personnel file is irrelevant to the basis of the Court's ruling in this entry, so the Court denies as moot this portion of the Defendants' motion to strike.

[3] The Defendants argue that the Plaintiffs Edward and Sherri Zimmer have no standing to assert individual constitutional claims, but the Plaintiffs have clarified their position that "[w]hile Ed and Sherri have their own individual state law claims, they have not asserted constitutional claims in their individual capacities, only in their capacity as next friends of R.Z."

restricting R.Z.'s ability to share her religious and political views, not simply responding to R.Z.'s alleged 'you're going to hell' comment."

With respect to each of these events, the Defendants argue that the Plaintiffs cannot put forth sufficient evidence from which a jury could determine that R.Z. was retaliated against for exercising her First Amendment rights. To state a First Amendment retaliation claim,[4] a plaintiff must establish that (1) her speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against her; and (3) there was a causal connection between this adverse action and the protected speech. *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008).

With respect to the first element, the Plaintiffs argue at length that R.Z.'s speech was protected, but they fail to identify what exactly this "speech" is. The Defendants argue that four possibilities exist: 1) R.Z.'s alleged statements to M.E. that he was going to hell made in conjunction with alleged harassment due to him having a gay brother; 2) statements that Campbell heard R.Z. make two years earlier that "if you do not believe in Jesus Christ, you are going to burn in hell" that were not directed toward a specific person; 3) R.Z.'s admitted statement about "gays ruling the world" once Obama took office and her statement that "God made Adam and Eve, not Adam and Adam"; and 4) statements that Obama's views on gay marriage and abortion were "against [her] religion." As the Defendants argue, the Plaintiffs' claim fails on any of these theories, as the first two statements are not protected speech and Campbell did not hear the latter two.

_____

[4] The Plaintiffs have asserted no other legal theory for their freedom of speech claim.

Public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). However, at the same time, public schools may regulate speech even when it would be impermissible for the government to do so were the speech to occur in the public sphere. *See, e.g., Morse v. Frederick*, 551 U.S. 393, 396-97 (2007). The Constitution permits the regulation of student speech in light of schools' unique purpose and role in society–educating youth. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682-83 (1986); *Tinker*, 393 U.S. at 509 (discussing a public school's authority to regulate speech in order to prevent disturbances in the classroom). As the Seventh Circuit has explained:

> A heavy federal constitutional hand on the regulation of student speech by school authorities would make little sense. The contribution that kids can make to the marketplace in ideas and opinions is modest and a school's countervailing interest in protecting its students from offensive speech by their classmates is undeniable. [ . . .] People are easily upset by comments about their race, sex, etc., including their sexual orientation, because for most people these are major components of their personal identity [. . . .] Such comments can strike a person at the core of his being.
>
> There is evidence, though it is suggestive rather than conclusive, that adolescent students subjected to derogatory comments about such characteristics may find it even harder than usual to concentrate on their studies and perform up to the school's expectations.

*Nuxoll ex rel. Nuxoll v. Indian Prairie School District #204*, 523 F.3d 668, 671 (7th Cir. 2008).

Accordingly, student speech that "materially and substantially interfere[s]" with schools' educating mission or that collides with the rights of other students may be proscribed. *Tinker*, 393 U.S. at 512-13 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)). A school is also free to disassociate itself from certain inappropriate conduct that would be protected in the public sphere by punishing that conduct in order to send a message that certain behavior is

socially unacceptable. *Bethel*, 478 U.S. at 682-83 ("The schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct"). In addition, "schools may take steps to safeguard those entrusted with their care from speech that can reasonably be regarded as encouraging illegal drug use." *Morse*, 531 U.S. at 397 (concluding that discipline of student who displayed banner saying "Bong Hits 4 Jesus" did not violate First Amendment).

Consistent with these cases, schools may prohibit student speech expressing opinion that other students are going to hell without violating the First Amendment:[5]

> In a public forum, the Christian can tell the Jew he is going to hell, or the Jew can tell the Christian he is not one of God's chosen, no matter how that may hurt. But it makes no sense to say that an overly zealous Christian or Jewish child in an elementary school can say the same thing to his classmate, no matter the impact. Racist and other hateful views can be expressed in a public forum. But an elementary school under its custodial responsibilities may restrict such speech that could crush a child's sense of self-worth.

*Muller ex rel. Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1540 (7th Cir. 1996). The Court has since further explained the permissible limits on student speech regarding another student's eternal salvation, this time with respect to another student's sexual orientation. In *Nuxoll*, a high school student sought a preliminary injunction against enforcement of a school rule that forbade "'derogatory comments' that refer to race, ethnicity, religion, gender, sexual orientation, or disability." The student claimed that the rule violated his First Amendment rights because it prevented him from wearing a t-shirt reading "Be Happy, Not Gay" in opposition to the "Day of Silence," which draws attention to harassment of homosexuals. *Nuxoll*, 523 F.3d at

---

[5] The Plaintiffs do not argue, and the Court does not believe, that the differences between a school and a school bus or a teacher and a bus driver are significant.

670. In the course of litigation, the student conceded that he could not assert a right to wear a t-shirt emblazoned with "homosexuals go to Hell" because those are fighting words, and the Seventh Circuit agreed, noting "the concession is prudent." *Id.* at 671. Ultimately, the Seventh Circuit denied the student a preliminary injunction, noting that the ban – which extended to phrases such as "homosexuals are going to hell" and "homophobes are closeted homosexuals" – was a permissible restriction on student speech. *Id.* at 674. As with restrictions on other forms of student speech, the key to this holding was the effect this speech could have on other students:[6]

> This particular restriction, it is true, would not wash if it were being imposed on adults, because they can handle such remarks better than kids can and because adult debates on social issues are more valuable than debates among children. It probably would not wash if it were extended to students when they are outside of the school, where students who would be hurt by the remarks could avoid exposure to them. It would not wash if the school understood "derogatory comments" to embrace *any* statement that could be construed by the very sensitive as critical of one of the protected group identities. (That may, as we'll see, be a problem with the school's application of its rule to the facts of this case.) But high-school students are not adults, schools are not public meeting halls, children are in school to be taught by adults rather than to practice attacking each other with wounding words, and school authorities have a protective relationship and responsibility to all the students.

---

[6] Campbell repeatedly grounds her speeches in these concerns: "You can't tell somebody who is, we have Buddhist, we have Sikhs, we have atheists, we have Muslims, we have Catholics, we have every kind of Christian imaginable on this bus. You can't say that stuff," and "And I thought, oh God. [R.Z.] don't do this to [M.E.]. It's gotta be embarrassing for him." Campbell also acknowledges the reasoning behind this restriction at her deposition: "I can't have it on the bus because I'm seeing other children are being upset by it. You can see it in their eyes."

*Id.* at 674-75 (citation omitted). For this reason, the first two comments mentioned by Plaintiffs in the course of their briefs are insufficient speech upon which to base the first element of their First Amendment retaliation claim.[7]

Furthermore, even if this speech were protected, the Plaintiffs have put forth insufficient evidence on the second element: an adverse action suffered by R.Z. "Outside the school context, an adverse action in a First Amendment retaliation case is 'conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 273 (2nd Cir. 2011). This is an objective test, but it is also context-specific, so Court conducts the analysis with an eye toward the special characteristics of schools. *Id.*

---

[7]  The Plaintiffs urge that Campbell is, for lack of a better phrase, hell-bent on preventing R.Z. from ever talking about her religion, and that this was the purpose of her "attacks." In support, they point out that M.E. did not use the words Campbell later attributes to him:

M.E.:  It's come to the point where like [R.Z.] is like harassing me because my older brother, not Walt, is gay and I'm kind of proud of it. You know?

B.C.:  You have every reason to be proud of it.

M.E.:  Yeah, I'm glad that he is happy and stuff.

B.C.:  I, you know [R.Z.'s] mom. They're very, extremely religious people.

M.E.:  I know. I'd say this is about the fifth time she said I'm going to hell.

B.C.:  I'll, I'll a, talk to her mom. I won't say anything on here because . . . .

Campbell's interpretation of M.E.'s statements appears to be yet another example of expectations and context gone awry. Regardless, the content of Campbell's speeches consistently focuses on the expression of this opinion, not some broader discussion about religion generally.

The Defendants argue that neither CCS nor Campbell disciplined R.Z. or otherwise took adverse action against her, because R.Z. was never disciplined or excluded from school activities, nor was she threatened with discipline or exclusion. While it is true that "First Amendment student speech cases ordinarily involve explicit censorship or avowedly disciplinary action by school administrators," *Cox*, 654 F.3d at 273, in the context student-teacher relationships, "[v]erbal censure is a form of punishment, albeit a mild one." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1268-69 (11th Cir. 2004). "Given the gross disparity in power between a teacher and a student, such comments–particularly in front of the student's peers–coming from an authority figure with tremendous discretionary authority, whose words carry a presumption of legitimacy, cannot help but have a tremendous chilling effect on the exercise of First Amendment rights." *Id.* Given the unique student-teacher relationship, it is possible that mere verbal censure by a teacher could constitute an adverse action.

While the Plaintiffs surpass the threshold as to the form of the adverse action, they fail on substance. An adverse action must not deter just any speech; rather, it must deter the exercise of First Amendment rights. The Plaintiffs argue that the policy articulated by Campbell prohibits a student who, "desiring to share their opinion about others," shares views that may be seen as intolerant. This policy would almost certainly run afoul of the First Amendment, and a speech articulating this policy would likely deter the exercise of First Amendment rights. Yet the Plaintiffs' characterization distorts the content of Campbell's speeches. At the summary judgment stage, the Court is not required to draw every conceivable inference, only reasonable ones, *e.g.*, *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 683 (7th Cir. 1999), and the inference sought here through the Plaintiffs' mischaracterization is not reasonable. Given what Campbell

said and how she said it – which, in this case, the jury would have the benefit of knowing *exactly* – no reasonable jury could find that Campbell's speech articulates a policy prohibiting a person from "sharing" a view that may be seen by some as intolerant. The conduct Campbell prohibits is far more narrow than the Plaintiffs describe it, for the policy articulated by Campbell is that one may not "throw" or "push" her views in another's face by saying that a person is going to hell because of his religion or sexual orientation. Indeed, the consistent message is the same as the policy found constitutionally acceptable in *Nuxoll*. In doing so, Campbell's speeches regulate student speech consistent with First Amendment protections. No reasonable jury could find, on the basis of the evidence of record, that Campbell's speeches deterred the exercise of protected First Amendment rights speech.[8]

The Court recognizes that the Plaintiffs have pointed to changes they have perceived in their daughter, changes that are certainly regrettable,[9] but it cannot be overlooked that the Plaintiffs simply fail to point to any Constitutional rights the exercise of which would be

---

[8] The Plaintiffs point to certain conversations Campbell had with other bus passengers, including when she refers to R.Z. as a "stupid little bigot," that are obviously inappropriate. R.Z. did not hear these statements; thus they are not relevant to this elements of a First Amendment retaliation claim. These statements may shed light on Campbell's motive, but that is not at issue. It is true that intent may come into play in assessing the causal connection between R.Z.'s protected speech and the adverse action, but because the Plaintiffs' claim fails on the first and second element, the Court need not decide whether a causal connection would exist on the basis of these statements.

[9] R.Z. became quiet and withdrawn after the incidents, to the point where her teachers sought assistance from the school guidance counselor, informing him that they were worried about R.Z. because she looked depressed and was shutting down. R.Z. had crying spells and difficulty sleeping. She is not as close to her religion as she used to be, reluctant to participate in religious activities, and much less willing to discuss religious issues and share her views. The fact that she is not as close to her religion is a separate source of distress for her.

deterred by Campbell's speeches. For this reason, the Plaintiffs have failed to put forth sufficient evidence that R.Z. was retaliated against as to the first two possible expressions by R.Z.

The Defendants argue that statements that "gays" would "rule the world" when Obama took office and "God made Adam and Eve, not Adam and Adam," and discussion about the conflicts between Obama's views on gay marriage and abortion with one's religion are protected speech. While this is likely the case, R.Z.'s claim nevertheless fails on the third element of her retaliation claim. As the Defendants point out, Campbell has testified that she could not hear the conversations of seventh and eighth graders because they sat in the back of the bus, and the Plaintiffs have provided no evidence suggesting that different circumstances prevailed on the day in question.[10] Campbell's inability to hear R.Z.'s statements necessarily severs any causal connection between these statements and Campbell's speeches.[11]

For the foregoing reasons, the evidence viewed in the light most favorable to the Plaintiffs fails to support their First Amendment retaliation claim, and the Defendants are entitled to summary judgment on that claim.

---

[10] The February 5, 2008, bus surveillance video was not produced by the Defendants and is now unavailable. The Plaintiffs argue that, because the video is unavailable, they are entitled to an inference that the video would show that Campbell could hear R.Z.'s conversations with M.E. The Plaintiffs seek this inference under the spoliation doctrine, which they erroneously assert is governed by Indiana law because one Seventh Circuit case applied Indiana law to a spoliation *tort* claim that the parties agreed was governed by Indiana law. *J.S. Sweet Co., Inc. v. Sika Chemical Corp.*, 400 F.3d 1028, 1032 (7th Cir. 2005). Indiana law has no application here given that federal jurisdiction rests on R.Z.'s constitutional claims. Furthermore, the spoliation doctrine requires that the movant demonstrate that the opposing party intentionally destroyed the evidence at issue in bad faith. *Norman-Nunnery v. Madison Area Technical Coll.*, 625 F.3d 422, 428 (7th Cir. 2010). The Plaintiffs have identified no such evidence.

[11] Campbell's speeches support her contention, as they focus solely on statements that other students are going to hell.

## B. Free Exercise of Religion Claim

The Free Exercise Clause provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Analysis of an alleged violation of this clause begins with an examination of "whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden." *Hernandez v. C.I.R.,* 490 U.S. 680, 699 (1989).

According to the Plaintiffs, "Campbell told R.Z. that she could not attend a public school and hold beliefs that homosexual conduct was wrong or that people who did not believe in Jesus Christ should be condemned. Campbell directly punished R.Z. for religious doctrines she believed to be false and sought to prevent R.Z. from sharing her religious beliefs with others." The Plaintiffs further argue that Campbell's pronouncements on what speech was acceptable left R.Z. with the Hobson's choice "between forsaking her own religious beliefs and suffering serious negative consequences of further insult from her bus driver and further alienation from her peers," and thus violated her right to free exercise of religion. In response, the Defendants argue that Campbell's speeches did not place a substantial burden on R.Z.'s practice of her religion. The Court agrees.

As discussed above, the expression toward which Campbell's lectures were directed is much narrower than the Plaintiffs have suggested. No reasonable jury could draw the inference that Campbell somehow conveyed to R.Z. that she had to abandon any of her religious beliefs. The Plaintiffs rely on Campbell's statement that "If you can't believe in tolerance towards one another, you don't belong here. You belong in a parochial school" in support of their argument,

but this statement simply does not reasonably translate into a statement that R.Z. was not permitted to attend public school and maintain her beliefs, nor does this statement force R.Z. to make a decision between holding her beliefs and continuing to attend public school.

Likewise, no reasonable jury could draw the inference that Campbell's conversation with R.Z. forced a Hobson's choice on R.Z. Campbell explicitly separated what students may believe from what students may say: "Cause you can't, no matter how you feel about it, you can't say it." Campbell further acknowledged that beliefs may differ: "You might not agree, I don't agree with what everybody says, nobody agrees with everybody, that's just the way it is. That's what I was trying to say this morning, the diversity is what makes this country strong. None of us are alike, none of us believe in the same thing, but that's why it works." The content of Campbell's lectures is simply insufficient to make the leaps Plaintiffs urge.

However, Campbell certainly did limit what students may say. To the extent that Campbell's restrictions limited R.Z.'s speech, the Defendants insist that R.Z. has no claim for free exercise separate from her free speech claim. Insofar as analysis of R.Z.'s free speech claim has already established that R.Z. has no First Amendment right to tell other students they are going to hell, the Defendants' argument has merit. It would make little sense to say that a student could not assert the right to condemn another student in the name of free speech, but this same student could assert the right to condemn another student in the name of free exercise, for regardless of motivation, the concern for the listener's well-being is the same. In truth, it is not as if this particular statement can ever be completely divorced from its theological underpinnings; the very reason the statement harms the schoolchild is because it concerns an important topic: one's eternal salvation. Thus, while in some ways a student's right to proclaim damnation may

be more properly cast in terms of that student's right to free exercise of religion than free speech, the outcome is the same: there is no right to do so in the school setting. As a result, while R.Z.'s right to tell another student that he is going to hell may be the expression of her religious belief, and it may be colloquially correct to say that this expression has been "burdened," perhaps even substantially, the First Amendment analysis conducted above establishes that this burden is a permissible one in the school setting and the school is justified in imposing it.

However, insofar as the Court merely assumed, without deciding, in the preceding free speech analysis that R.Z.'s statements that "gays" would "rule the world," "God made Adam and Eve, not Adam and Adam," and Obama's views are against her religion may be protected speech, but held R.Z's claim insufficient on the third element of her retaliation claim, R.Z.'s free exercise claim is not duplicative of her free speech claim. For purposes of this inquiry, the Court assumes again that R.Z. has a right to make the statements she did and further assumes that R.Z.'s statements are expressions of her religious belief. R.Z. must then put forth sufficient evidence to suggest that her expression of these beliefs has been substantially burdened. Here, R.Z.'s argument fails. R.Z. has put forth no evidence that her expression of these beliefs was burdened, much less substantially, because no reasonable jury could draw the inference the Plaintiffs urge. Campbell's speeches to the whole bus and to R.Z. alone just do not go so far as to restrict R.Z.'s ability to generally state her beliefs. During her speech to the bus, Campbell states repeatedly that the offending speech in this case is telling another student that he is going to hell. Later, during her conversation with R.Z. and her mother, Campbell draws the distinction quite clearly:

> Sherri: So he can have his opinion that gay people are just fine, but she can't have her opinion that they're not? Right?

B.C.: If her opinion is standing in front of a bus and saying "Your brother is going to go to hell." That isn't the same.

[ . . . ]

Sherri: So? It is a helluva lot worse than telling somebody that I don't agree with gay marriage. She can [dis]agree with gay marriage.

B.C.: That's not what she said to him. She said your brother is going to hell.

Given these statements, no reasonable jury could draw the inference that Campbell's speeches effectively restrict R.Z.'s ability to state her beliefs generally. For the foregoing reasons, R.Z.'s free exercise claim fails.

### C. Equal Protection Claim

Finally, Plaintiffs argue that Campbell's speeches violated R.Z.'s rights under the Equal Protection Clause. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). To establish a violation of the Equal Protection Clause, it must first be shown that the Defendants' actions resulted in similarly-situated individuals receiving disparate treatment. *Id.* The Plaintiffs have put forth no evidence regarding the treatment of other students, and therefore the Plaintiffs have not shown that similarly-situated individuals received disparate treatment sufficient to avoid summary judgment.[12]

---

[12] It bears mention that the Plaintiffs *argue* that R.Z. was treated differently than other students because of her Christian views, but their argument is just another example of contextualization gone awry:

Campbell provided her "acceptable" position on homosexuality and religion, then specifically informed R.Z. and others they were not allowed to espouse contrary positions. Campbell told R.Z. she was not allowed to share her religious views. Far from allowing an "equality of status in the field of ideas," Campbell made it clear that some ideas (such as tolerance and acceptance of gay marriage) were

## D. State Law Claims

This case originally was filed in Hamilton Superior Court and was removed to this Court by the Defendants based upon the Plaintiffs' constitutional claims. The Court's jurisdiction over the Plaintiffs' remaining state law claims is based on 28 U.S.C. § 1367, which provides for the exercise of supplemental jurisdiction over claims based upon state law that are closely related to the federal claims in a case. However, "[w]hen the federal claim in a case drops out before trial, the presumption is that the district judge will relinquish jurisdiction over any supplemental claim

---

> acceptable conversation on the school bus but contrary views (such as moral objection to homosexual conduct or the belief that saving faith in Jesus Christ is necessary to eternal life) were not. It is hard to imagine a more blatant violation of the protections of the Equal Protection Clause than a public school official telling a student that if she wanted to share her views on such subjects she needed to attend a parochial school.

But, yet again, the Plaintiffs stretch Campbell's speech too far. During her conversation with R.Z., Campbell did go off on a tangent about the reasons that some people support gay marriage, but contrary to the Plaintiffs' argument, she made it clear that the students riding her bus were not required to espouse these views.

> That's what this is all about, there's different, there's different rules that they are throwing in, that's what, it's not about a moral thing. I'm not crazy about it either, but I don't think they have the right to take those things away from them. You know what I'm trying to say. It is not morally, it's not going there at all, but darlin' you gotta ease up. Talk to her [Directed at S.Z.]. Cause you've never, I've known you guys for years, and you gotta, you gotta just back off, ya know, let sleeping dogs lie or whatever. You might not agree, I don't agree with what everybody says, nobody agrees with everybody, that's just the way it is. That's what I was trying to say this morning, the diversity is what makes this country strong. None of us are alike, none of us believe in the same thing, but that's why it works. You can't push your own view on somebody else.

Similarly, Campbell never told R.Z. that she could not believe or could not share contrary views. Nor did Campbell tell R.Z. that, if she wanted to share her views on such subjects, she should attend a parochial school. Rather, Campbell told R.Z. that "if you were in a church school, you could talk like that."

to the state courts." *Leister v. Dovetail, Inc.*, 546 F.3d 875, 882 (7th Cir. 2008). There are exceptions to that general rule, and the court should decide the merits of a supplemental state claim when (1) the statute of limitations has run, precluding the filing of a separate suit in state court; (2) substantial *judicial* resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is "absolutely clear" how the state claims should be decided. *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008) (emphasis added). None of those exceptions apply here. Remanding the case to Hamilton Superior Court will avoid any statute of limitations problems; none of this Court's resources have been expended on the state law claims, *see id.* ("the district court disposed of the federal claims on summary judgment, and so 'substantial judicial resources' have not yet been committed to the case"); and it does not appear to the Court that the proper resolution of the state law claims is so obvious as to overcome the presumption that remand is appropriate. Accordingly, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

## IV. CONCLUSION

For the reasons set forth above, the Defendants' motion for summary judgment as to the Plaintiffs' free speech, free exercise, and equal protection claims is hereby **GRANTED**.[13] In the absence of any remaining federal claims, the Court declines to continue to exercise supplemental jurisdiction over the state law claims set forth in the Plaintiffs' Complaint; accordingly, those

---

[13] Because the Plaintiffs' claims are disposed of on these grounds, the Court does not address whether Campbell may also be entitled to qualified immunity or whether CCS may avoid liability under *Monell.*

claims are **REMANDED** to the Hamilton Superior Court. **The Clerk shall mail a certified copy of this remand order to the Clerk of the Hamilton Superior Court.**

      SO ORDERED:  04/11/2012

*William T Lawrence*

    Hon. William T. Lawrence, Judge
    United States District Court
    Southern District of Indiana


Copies to all counsel of record via electronic communication.